## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | No.  13-10292-MLW |
| | ) | |
| | ) | |
| ROBERT BURTON | ) | |

### DEFENDANT'S SENTENCING MEMORANDUM

Robert Burton submits this sentencing memorandum in support of his request for a sentence of 6 months of imprisonment, followed by three years of supervised release the first 6 months of which would be served in home confinement.  It is also requested that this home confinement special condition be fashioned in such a way as to allow Mr. Burton to obtain employment so that he can honor whatever restitution obligations are imposed as a part of his judgment order. The sanction requested is "sufficient, but not greater than necessary" to achieve the purposes of sentencing set forth in 18 U.S.C. § 3553(a)(2).

The seriousness of Mr. Burton's offense is clearly reflected in the financial hardships likely suffered by the named victims as result of these fraudulent investment arrangements.  The pertinent question for this Court is whether, in the face of that collective financial hardship, there is an overwhelming need to further incapacitate Mr. Burton through a lengthy term of imprisonment thereby delaying his efforts to repay these individuals as quickly as possible.  Mr. Burton is remorseful for his actions and has already been subjected to incarceration at the Donald Wyatt Detention Facility where he has been held in this matter for approximately 5 months.  He had never served a day in prison prior to this experience.  The guidelines range applicable in this case, 37-46 months, provides no useful advice as it was not developed based on empirical data or

national experience and fails to satisfy any purpose of sentencing.  A departure or variance from

this range to the proposed sentence is appropriate for a number of reasons including the fact that

Mr. Burton's criminal history is arguably overstated and also to allow the Court to avoid

unwarranted sentencing disparity with similarly situated individuals.

**FACTS**

**A.      Burton's history with "Pinnacle"**

The story of Robert Burton is a cautionary tale that demonstrates the devastating

consequences that can arise for an intelligent and talented individual growing a business in a

quick and, at times, reckless manner.  Mr. Burton graduated from the Massachusetts School of

Law in 2005 and obtained his Juris Doctor degree.  *See* PSR ¶ 92.  He sat for the Massachusetts

Bar Examination on one occasion and did not achieve a passing score.  Instead of refocusing his

efforts on passing the bar and obtaining his license to practice law, he worked at various law

firms as a paralegal in a support capacity.  During this time, Mr. Burton also worked on his

dream, developing his "Pinnacle" financial services company.

The idealistic motivation behind the development of Pinnacle was to provide important

financial services such as tax preparation, loan modifications, debt consolidation, and bankruptcy

petition preparation to a growing, and underserved, local minority community.  The majority of

these individuals did not have the funds to pay attorneys to help them with these issues and Mr.

Burton sought to provide them with a more cost efficient solution that would allow him to have a

successful business while providing a much needed service to a community that he himself

sprang from.

This was a noble gesture that eventually went awry.  At the beginning of this venture,

things started well and the business eventually began growing at a rapid rate.  Mr. Burton had set

2

up office space in the Lawrence, MA area with 8-10 employees and both the loan modification and bankruptcy petition preparation portions of the business were extremely busy.  Through his efforts, Mr. Burton was able to provide real assistance and positive results for many of the clients that hired him.  *See* attached Exhibit A, Letter of Diamela Peguero-Collazo.  This is true of both the loan modification and bankruptcy preparation petition aspects of his business.[1]  Problems began when the United States Trustee, the United States Bankruptcy Court, and the Attorney General of the Commonwealth of Massachusetts began to scrutinize Mr. Burton's business practices.

The essence of both the bankruptcy and the state Attorney General civil cases against Mr. Burton and Pinnacle was that he had engaged in the unauthorized practice of law.  Although Mr. Burton was thorough in telling his clients that he was not an attorney and that he was not providing them with legal advice, the Bankruptcy Court found after a trial that he had crossed that line on more than one occasion.  These were cases of first impression in Massachusetts in the sense that non-attorney bankruptcy petition preparers as described in 11 U.S.C. § 110 were being told exactly what they could and could not do via the U.S. Bankruptcy Court's narrow interpretation of that statute.  Mr. Burton and Pinnacle were thus held out as an example of how this type of petition preparation business should *not* be run.

The Attorney General for the Commonwealth then followed the Bankruptcy Court's lead and commenced a civil action against Mr. Burton alleging false and or deceptive business practices based upon similar allegations of the unauthorized practice of law.  These cases have effectively ended Pinnacle's operations in Massachusetts and have imposed a great financial cost

---

[1] Filings in Mr. Burton's U.S. Bankruptcy Court matter confirm that he and Pinnacle prepared successful bankruptcy petitions for a little over 70% of their clientele.

on Mr. Burton in the form of orders of disgorgement of client fees, fines, and injunctions limiting his ability to earn a living.

Mr. Burton's business model was innovative and successful for a time but he made one critical miscalculation:  he was servicing a client base that required much more legal and business guidance than he was authorized to give.  As a non-attorney bankruptcy petition preparer, Mr. Burton was unrealistic in thinking that the average non-English speaking individual with little education from the Lawrence area would have the wherewithal to independently and accurately value their properties, compile their credit information, and make a knowledgeable decision about what type of bankruptcy petition to file.  They couldn't do it so he and his employees routinely did these things for them.  This was not done to hike the fees charged and "fleece" a vulnerable clientele but instead out of a genuine desire to help people who were in many instances desperate and could not help themselves.  Unfortunately, Mr. Burton bit off more than he could chew with Pinnacle and ended up making sloppy mistakes in order to compensate for his clientele's lack of knowledge regarding complicated legal issues.[2]

The same passionate and occasionally reckless business approach that fueled Pinnacle's growth and eventual bankruptcy troubles also bled into the investment prong of Burton's operations.  It is interesting to note that this was not a large part of Pinnacle's business and that the named victims of the fraud perpetrated in this case all had personal relationships with Mr. Burton which led to their investment arrangements.  The deals made with these individuals were not well-crafted, not explained clearly, and came with promises of large profits that never

---

[2] As an example, the Bankruptcy Court found that debtor clients of Pinnacle were provided with information to guide them on what exemptions they could claim on Schedule C of their individual petitions.  These materials were found to be incomplete in terms of not listing all possible legal exemptions and the non-bankruptcy legal references contained were to *Minnesota* and not Massachusetts statutes.  *See* U.S. Bankruptcy case No. 12-04037, Document 34, pp. 7.

materialized.  The money of the victims was gone and Mr. Burton yet again placed himself in a difficult position where he could not get it back to them as he had promised.  Mr. Burton feels terribly about the financial hardship caused to his former friends and business associates and wants, desperately, to help them get their investment monies back.  Similarly, he is ashamed of the tax fraud portion of this case that involved purposeful omission of income information and misrepresentations about dependents geared toward maximizing refunds.  He prays that the Court will impose the sentence he has requested so that he can work diligently to repay everything that he has taken and to regain some modicum of redemption for his mistakes.

**B.      Post-plea conduct and breach of plea agreement**

Since the date of Mr. Burton's change of plea, his circumstances have changed in such a drastic way that he will not be able to pay the minimum $50,000 restitution payment that he agreed to make under the binding plea agreement with the government.  *See* Plea Agreement ¶ 5(e).  Mr. Burton was ordered detained by Magistrate Judge Boal on October 3, 2014 after she found that he had violated his curfew condition and had not been truthful with Pretrial Services about his whereabouts.[3]  After apologizing to the Court and the supervising Pretrial Services Officer for this error and noting that he had been compliant with his release conditions generally, he was not able to obtain his release and remains detained through the date of the scheduled sentencing hearing.  An unfortunate result of his custody status is that he lost his employment with Northeast Remediation Services ("NER") and his ability to generate income to pay toward restitution.

---

[3] A few days prior on September 30, 2014, Judge Henry Boroff had ordered Mr. Burton detained on a contempt finding when he had not complied with an order to disgorge fees that had previously been issued.

It is important to note that Mr. Burton did not sign off on the restitution term in the plea agreement lightly.  He had every intention of having that money for the sentencing hearing. When he began working for NER while on pretrial release, part of his business arrangement with the company owner was that he would work for the company, grow it, and run it for a particular period of time.  Another term of the agreement was that the owner of NER would provide Mr. Burton with the money needed to pay restitution in this case.  That arrangement dissolved when Mr. Burton was detained by both the Bankruptcy Court and this Court at the end of September 2014 and his employment had to be terminated because he was unavailable.

On December 12, 2014, Magistrate Judge Boal conducted a further hearing on Mr. Burton's motion for reconsideration of her detention order.  He provided new information to the Court indicating that Judge Boroff had lifted the contempt finding and released him about a week before the December 12 hearing.   He also pleaded with the Court to release him so he could sell various personal belongings and assets to generate whatever monies he could in order to avoid failing his plea agreement restitution obligation. The NER money was no longer available and he wanted to do everything possible to provide some payment to the victims by the date of sentencing.  Unfortunately, the release request was denied after the hearing.

For purposes of the sentencing hearing in this matter, Mr. Burton is in agreement that he breached the terms of the binding plea agreement by violating the curfew condition of his pretrial release and because he will not have the ability to make the required $50,000 restitution payment.  *See* Plea Agreement, ¶ ¶ 4(g), 14, 5(e).  The government's intent is to exercise its right to declare the agreement null and void pursuant to paragraph 13 of same agreement.  Mr. Burton does not intend to withdraw his guilty plea as a result of this action.  He wishes to proceed with sentencing and, if necessary, would engage in a further colloquy with this Court in that regard.

**C.      The advisory range and the overstatement of Mr. Burton's criminal history**

In the PSR, the Probation Department sets the total base offense level in this matter at 20 and places Mr. Burton in a criminal history category ("CHC") of II.  This results in a range of 37-46 months.  *See* PSR ¶ 110.  The PSR assigns one criminal history point for the 2010 operating under the influence case described in paragraph 60.  This was a continuance without a finding ("CWOF") that resulted in a dismissal of the charge in 2012.  The PSR then assigns 2 additional points because a portion of the offense conduct in this matter took place while the CWOF was still pending likely due to failure to pay a related fee or fine.  As result, 3 points place Mr. Burton in CHC II.

The Court should depart to CHC I in this case as the 3 points derived from the OUI matter overstate Mr. Burton's criminal history.  U.S.S.G. Section 4A1.3(b)(1) allows for such a departure if reliable information indicates that the defendant's criminal history category substantially over-represents the seriousness of the defendant's criminal history or the likelihood that the defendant will commit other crimes.  In its sentencing memorandum, the government agrees that CHC II is overstated.  *See* Government's Memorandum, pp. 15.  At a total offense level of 20 and a CHC II the resulting sentencing range would be reduced to 33-41 months.

## ARGUMENT

A sentence of 6 months followed by 6 months of home confinement and 3 years of supervised release would best satisfy the goals of 18 U.S.C. § 3553(a).  The Court must "impose a sentence sufficient, but not greater than necessary, to comply with the purposes set forth in paragraph (2)," which are "the need for the sentence imposed—

(A) to reflect the seriousness of the offense, to promote respect for the law, and to

provide just punishment for the offense;

(B) to afford adequate deterrence to criminal conduct;

(C) to protect the public from further crimes of the defendant; and

(D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner."

18 U.S.C. § 3553(a)(2).  In "determining the particular sentence to be imposed," the Court must consider these purposes, the nature and circumstances of the offense and the history and characteristics of the defendant, the need to avoid unwarranted disparities, and the need to provide restitution to any victims of the offense.  *See* 18 U.S.C. § 3553(a)(1)–(7).

"While the fraud guideline focuses primarily on aggregate monetary loss and victimization, it fails to measure a host of other factors that may be important, and may be a basis for mitigating punishment, in a particular case."  Allan Ellis, John R. Steer, Mark Allenbaugh, *At a "Loss" for Justice:  Federal Sentencing for Economic Offenses*, 25 Crim. Just. 34, 37 (2011); *see also United States v. Ovid*, slip op., 2010 WL 3940724, *1 (E.D.N.Y. Oct. 1, 2010) ("[T]he fraud guideline, despite its excessive complexity, still does not account for many of the myriad factors that are properly considered in fashioning just sentences, and indeed no workable guideline could ever do so.").  A substantial variance is needed in this case because of the following mitigating factors, all of which are highly relevant to the purposes of sentencing and none of which are taken into account by the guideline range.

## 1.       Need for Just Punishment in Light of the Seriousness of the Offense and Deterrence

Each of the victims in this case suffered a substantial personal financial loss ranging from $25,000 to $75,000.   Although the harm to these people was devastating on an individual level, the total amount of money involved, $159,000, was relatively small in comparison to other fraud cases this Court routinely handles.  This assessment is not made in an effort to minimize Mr.

Burton's conduct but to emphasize that these individuals can be made whole quickly given the amount of money involved.  The proposed sentence of 6 months in custody and 6 months in home confinement would serve the dual goals of specific and general deterrence. Mr. Burton is a first time offender and has never seen the inside of a jail cell until this case began.  He has spent months in custody and it has been an awful experience.  He does not anticipate ever being foolish enough to do anything in the future that would put him back in prison.  Similarly, the custody sentence suggested would send a strong message to other first time fraud offenders that the Court is not tolerant of fraudulent conduct and is prepared to impose serious punishment.

Research has consistently shown that while the certainty of being caught and punished has a deterrent effect, "increases in severity of punishments do not yield significant (if any) marginal deterrent effects." Michael Tonry, *Purposes and Functions of Sentencing*, 34 Crime & Just. 1, 28 (2006).  "Three National Academy of Science panels . . . reached that conclusion, as has every major survey of the evidence." *Id*.; *see also* Zvi D. Gabbay, *Exploring the Limits of the Restorative Justice Paradigm: Restorative Justice and White Collar Crime*, 8 Cardozo J. Conflict Resol. 421, 447-48 (2007) ("[C]ertainty of punishment is empirically known to be a far better deterrent than its severity.").  Typical of the findings on general deterrence are those of the Institute of Criminology at Cambridge University.  See Andrew von Hirsch et al., *Criminal Deterrence and Sentence Severity*:  *An Analysis of Recent Research* (1999), summary available at http://members.lycos.co.uk/lawnet/SENTENCE.PDF. The report, commissioned by the British Home Office, examined penalties in the United States as well as several European countries.  *Id.* at 1.  It examined the effects of changes to both the certainty and severity of punishment. *Id*. While significant correlations were found between the certainty of punishment and crime rates, the "correlations between sentence severity and crime rates . . . were not sufficient to achieve

statistical significance." *Id.* at 2.  The report concluded that "the studies reviewed do not provide

a basis for inferring that increasing the severity of sentences is capable of enhancing deterrent

effects." *Id.* at 1.   Research regarding white collar offenders in particular (presumably the most

rational of potential offenders) found no difference in the deterrent effect of probation and that of

imprisonment.  *See* David Weisburd et al., *Specific Deterrence in a Sample of Offenders*

*Convicted of White Collar Crimes*, 33 Criminology 587 (1995); *see also* Gabbay, supra, at 448-

49 ("[T]here is no decisive evidence to support the conclusion that harsh sentences actually have

a general and specific deterrent effect on potential white-collar offenders.").

 While bolstering deterrence, the proposed sentence also promotes respect for the law in

that it will not only punish Mr. Burton by severely restricting his liberty for a total of 12 months

followed by two and a half years of supervised release but also will allow him the opportunity to

repay restitution to the victims quickly.  If the Court accepts and imposes a sentence that

includes a home confinement component, it should incorporate parameters that allow Mr. Burton

to obtain employment and make good on his promise to repay the $159,000 owed to the victims.

Moreover, although the original plea agreement in this case will likely become a nullity, Mr.

Burton is still willing to sell whatever assets he can upon his release from incarceration and

surrender a percentage of his yearly income to cover his restitution obligation.

**2.** **Mr. Burton's conduct was aberrant.**

 Mr. Burton has essentially lived a law-abiding life until the instant offense began several

years ago.  He is a decent person who has many friends in the community that have provided

letters of support to the Court.  *See* Exhibit A.  They know him as a kind, loving, and successful

individual who had the misfortune of briefly losing his way professionally with Pinnacle's rapid

growth.  His offense is completely uncharacteristic when viewed in the context of his entire and

productive adult life.  This Court should grant a variance based on the aberrant nature of his conduct.  *See, e.g.*, *United States v. Howe*, 543 F.3d 128 (3rd Cir. 2008) (variance based on "isolated mistake" in otherwise long and entirely upstanding life); *United States v. Hadash*, 408 F.3d 1080, 1084 (8th Cir. 2005) (defendant was a "law abiding citizen, who [did] an incredibly dumb thing"); *United States v. Davis*, 2008 WL 2329290 (S.D.N.Y. June 5, 2008) (defendant was a first offender who had worked throughout his 15-year marriage to educate his six children and whose offense was prompted by economic pressures).

**3.     Mr. Burton has already been punished severely above and beyond his several months in custody.**

As result of the U.S. Bankruptcy Court ruling, state Attorney General proceedings, and this federal criminal matter, Mr. Burton has lost his business, his professional reputation, and his ability to work in the financial industry.   This is in addition to the exceedingly harsh conditions of pre-trial confinement he has experienced.  Mr. Burton's dreams of creating a model financial services business have been dashed, albeit by his own hand, and can likely never be resurrected. This is a painful reality that he will live with going forward.

Given his clear intelligence and promise, this Court should consider Mr. Burton's loss of potential profession and reputation, *see, e.g.*, *United States v. Gaind*, 829 F. Supp. 669, 671 (S.D.N.Y. 1993) (granting downward departure where defendant was punished by the loss of his business); *United States v. Vigil*, 476 F. Supp. 2d 1231, 1235 (D.N.M. 2007) (finding variance appropriate where defendant was collaterally punished by loss of his position and reputation, widespread media coverage, and emotional toll of two lengthy public trials); *United States v. Samaras*, 390 F. Supp. 2d 805, 809 (E.D. Wis. 2005) (granting variance in part because defendant lost a good public sector job as a result of his conviction), as well as the exceedingly harsh conditions of his pretrial confinement.  *See, e.g.*, *United States v. Carty*, 264 F.3d 191, 196

(2d Cir. 2001) ("pre-sentence confinement conditions may in appropriate cases be a permissible basis for downward departures").  It would be unjust and a disservice to the victims in this case to subject Mr. Burton to further imprisonment.

**4.     Need to Avoid Unwarranted Disparities and Unwarranted Similarities**

The Court must consider the need to avoid unwarranted disparities among defendants with similar criminal histories convicted of similar criminal conduct.  18 U.S.C. § 3553(a)(6). The court should avoid unwarranted similarities in sentencing among defendants who are different in ways not accounted for in the guideline range, *see Gall v. United States*, 552 U.S. 38, 55 (2007) ("need to avoid unwarranted *similarities* among other co-conspirators who were not similarly situated"); *United States v. Ovid*, 2010 WL 3940724 (E.D.N.Y. 2010) (sentencing two defendants with similar guideline ranges to 60 months and 126 months respectively based on distinctions in circumstances of the offenses and characteristics of the defendants), and unwarranted differences among defendants whose conduct and characteristics are similar.  *See United States v. Parris*, 573 F. Supp. 2d 744, 753, 756-62 (E.D.N.Y. 2008).

In fiscal year 2010, sentences below the guideline range were imposed in 41% of all fraud cases; 18% were government-sponsored, 23% were non-government sponsored.  *See* U.S. Sent'g Comm'n, *Preliminary Quarterly Data Report, Fourth Quarter FY 2010*, tbl.5.  The chart below includes a sample of fraud cases from districts across the country, many of which involved losses far greater than in this case, in which defendants received sentences substantially below the guideline ranges applicable in those cases, and substantially below the guideline range the Probation Department had quoted in the PSR.  As here, none of the defendants in these cases received a departure based on cooperation.  This Court should take into account the national sentencing trend exemplified by the Commission's data and this chart.

In *United States v. Parris*, 573 F. Supp. 2d 744 (E.D.N.Y. 2008),  Judge Block in the Eastern District of New York took a similar collection of cases into account in fashioning an appropriate sentence for two securities fraud offenders.   At the court's request, each party submitted a sample group of cases to illustrate the sentences imposed in other securities fraud cases.  *Id*. at 752.  Based on these samples, the court concluded that "[t]hose [defendants] who were not cooperators and were responsible for enormous losses were sentenced to double-digit terms of imprisonment (in years); [while] those whose losses were less than $100 million were generally sentenced to single-digit terms." *Id.* at 753.  The court relied on this national pattern in arriving at a sentence of 60 months for the two defendants who faced an advisory guideline range of 360 months to life, which was 16.7% of the bottom of the applicable guideline range.  *Id.* at 745.  (*See Table of Case Dispositions Attached Below*).

At 6 months, Mr. Burton will have served a prison sentence that is 16% of the bottom of the applicable guideline range according to Probation's estimate in the PSR (37 months).  The defendants in *Parris* had no particular mitigating factors that were utilized to support the variance allowed in that case.  Lastly, this Court granted a downward variance in the case of *United States v. Carmen Soto*, 11-CR-10310 MLW where the defendant was convicted of mail fraud.  This was a mortgage fraud scheme where the total loss/restitution figure was $792,559.  The applicable guidelines range was 46-57 months and the Court imposed a sentence of one year and one day followed by 3 years of supervised release the first 6 months of which would be served in home confinement.  Although the judgment order in that case indicated a variance was given due to the "physical condition" of the defendant, this case is highlighted to demonstrate what types of sentences are imposed in other fraud prosecutions.  See also,

**5.      Need to Provide Restitution to Victims of the Offense**

In determining the appropriate sentence, this Court must consider "the need to provide restitution to any victims of the offense." *See* 18 U.S.C. §3553(a)(7); *see also*, *e.g.*, *United States v. Menyweather*, 447 F.3d 625, 634 (9th Cir. 2006) (acknowledging district court's discretion to depart from guidelines to impose probationary sentence, since the "goal of obtaining restitution for the victims of Defendant's offense . . . is better served by a non-incarcerated and employed defendant"); *United States v. Peterson*, 363 F. Supp. 2d 1060, 1061-62 (E.D. Wis. 2005) (granting a variance so that defendant could work and pay restitution).

The victims in this case, and the government on their behalf, have stressed the need for restitution and Mr. Burton wishes to provide it.  He is college-educated, has a law degree, is hardworking, and a particularly talented individual.  With his personal charm and high energy level, he was highly successful at most every educational and employment endeavor he entered. There is every reason to believe that he can obtain a reasonably well-paying job once he is released as exemplified by his work with NER.  If Mr. Burton were sentenced within the advisory guideline range, he would not be released for another two and a half years.  The victims in this case would thus wait a lengthy period for him to make any restitution.  This Court should seek to maximize, rather than eliminate, his ability to make the restitution the victims have demanded.

**6.     Kinds of Sentences Available**

This Court must now consider all of "the kinds of sentences available" by statute, §3553(a)(3), even if the "kinds of sentences . . . established [by] the guidelines" zones recommend only a lengthy prison term.  *See Gall*, 128 S. Ct. at 602 & n.11.  The split sentence requested by Mr. Burton is especially appropriate in light of his immediate need to repay restitution.

Further, Congress directed the Commission to "insure that the guidelines reflect the general appropriateness of imposing a sentence other than imprisonment in cases in which the defendant is a first offender who has not been convicted of a crime of violence or an otherwise serious offense," and the "general appropriateness of imposing a term of imprisonment on a person convicted of a crime of violence that results in serious bodily injury." 28 U.S.C. § 994(j). Congress issued this directive in the belief that "sentencing decisions should be designed to ensure that prison resources are, first and foremost, reserved for those violent and serious criminal offenders who pose the most dangerous threat to society," and that "in cases of nonviolent and non-serious offenders, the interests of society as a whole as well as individual victims of crime can continue to be served through the imposition of alternative sentences, such as restitution and community service." *See* Pub. L. No. 98-473, § 239, 98 Stat. 1987, 2039 (1984) (set forth at 18 U.S.C. § 3551 note). Mr. Burton is clearly not a "violent and serious offender" who "pose[s] the most dangerous threat to society." He wishes to work in order to make restitution, and should be released from prison to home confinement after a 6 month term.

## CONCLUSION

For the foregoing reasons, Mr. Burton respectfully submits that a sentence of 6 months followed by six months home confinement as a special condition of three years supervised release is sufficient, but not greater than necessary, to satisfy the purposes of sentencing.

**Respectfully Submitted,**

**ROBERT BURTON**
**By His Attorney**

*/s/ Oscar Cruz, Jr.*

**Oscar Cruz, Jr.**
**Federal Public Defender Office**
**51 Sleeper Street, 5th Floor**
**Boston, MA 02210**
**617-223-8061**
**Email:** Oscar_Cruz@fd.org

## CERTIFICATE OF SERVICE

I, Oscar Cruz, Jr., hereby certify that this Sentencing Memorandum was delivered electronically to Assistant U.S. Attorney Sarah Walters, on December 15, 2014.

*/s/ Oscar Cruz,Jr.*
**Oscar Cruz, Jr.**

Case

| Case | Conviction | Loss | Guideline Range | Sentence Imposed/% of guideline range |
|---|---|---|---|---|
| **Christian Milton**, AIG, Vice President (D. Conn. 2009) | Convicted at trial of various counts of fraud. | | **LIFE imprisonment** | **48 months**[1] 10% of guideline range; life treated as 470 months |
| **Ronald Ferguson**, CEO, General Reinsurance Corp. (D. Conn. 2008) | Convicted at trial of conspiracy, securities fraud, false statements to SEC, and mail fraud. | **$544 million** | **LIFE imprisonment** | **24 months**[2] 5% of guideline range; life treated as 470 months |
| **Travis Correll**, (N.D. Ga. 2008) | Pled guilty to wire fraud (related to Ponzi scheme). | **$29 million** (ordered in restitution) | **188-235 months** | **144 months** 76% of guideline range  (Correll was initially sentenced to 144 months, but later received a further reduction to 108 months under Rule 35.[3]) |
| **Robert Cole**, Sales Rep., Diebold (N.D. Ohio 2008) | Pled guilty to securities fraud. | **$509,000** | **30-37 months** | **12 months and 1 day**[4] 40% of guideline range |
| **William Ledee**, Founder of fictitious insurance company (N.D. Ga. 2007) | Pled guilty to making false financial statements, engaging in business of insurance as a convicted felon, mail fraud, conspiracy to commit money laundering, etc. | **$21.6 million** (ordered in restitution) | The PSR indicated a total offense level of 51, and criminal history category II, resulting in a guideline range of **LIFE**.[5] | **70 months** 15% of guideline range; life treated as 470 months  (varied below type C agreement's cap of 7.5 years[6]) |
| **John Whittier**, Manager, Wood River Partners (S.D.N.Y. 2007) | Pled guilty to securities fraud, failure to disclose ownership in excess of 5% of publicly traded security, and failure to disclose ownership in excess of 10% of publicly traded security. | **$88 million** (ordered in restitution) | **188-235 months** | **36 months**[7] 19% of guideline range |

| | | | | |
|---|---|---|---|---|
| ***Hector Orlansky***, President, E.S. Bankest (S.D. Fla. 2007) | Convicted at trial of conspiracy to commit bank fraud and wire fraud, bank fraud, making false statements, wire fraud, conspiracy to commit money laundering, and money laundering. | **$164.5 million** (ordered in restitution) | 262-327 months | **240 months**[8] 91.6% of guideline range |
| ***Richard Adelson***, CEO & President, Impath (S.D.N.Y. 2006) | Convicted at trial of conspiracy, securities fraud, and filing false reports with SEC. | **$50 - $100 million** (court ordered restitution of $50 million) | Guidelines called for **life imprisonment**; statutory maximum was **85 years**. | **42 months**[9] 9% of guideline range; life treated as 470 months |
| ***Jamie Olis***, Tax Lawyer, Dynegy (S.D. Tex. 2006) | Convicted at trial of: (1) conspiracy to commit securities fraud, mail fraud, wire fraud, (2) securities fraud, (3) mail fraud, and (4) wire fraud. | **$79 million** | 151 -188 months | **72 months**[10] 47% of guideline range |
| ***E. Kirk Shelton***, Vice Chairman, Cendant Corporation (D. Conn. 2005) | Convicted at trial of: (1) conspiracy to commit securities fraud, mail fraud, wire fraud, and false statements to SEC, (2) mail fraud, (3) wire fraud, (4) false statements to SEC, (5) securities fraud. | **$3.275 billion** (ordered in restitution) | 151-188 months (1997 Guidelines were used; 2006 Guidelines would have called for life imprisonment, limited by a statutory cap of 300 months) | **120 months**[11] 79% of guideline range |
| ***Bernard Ebbers***, CEO, WorldCom (S.D.N.Y. 2005) | Convicted at trial of conspiracy, securities fraud, making false filings with the SEC. | **Over $1 billion** | 360 months to life | **300 months**[12] 83% of guideline range |
| ***Sanjay Kumar***, CEO, Computer Associates Int'l (E.D.N.Y. 2006) | Pled guilty to conspiracy to commit securities fraud and wire fraud, securities fraud, false statements to SEC, conspiracy to obstruct justice, obstruction of justice, and false statements. | **$2.2 billion** (according to Gov't's Sent'g Memo) | **LIFE imprisonment** under 2005 Guidelines **188 to 235** under 1998 Guidelines (Unclear how District Court resolved dispute over which version should apply.) | **144 months**[13] 30% of guideline range; life treated as 470 months |

| | | | | |
|---|---|---|---|---|
| **Stephen Richards**, Sr. Vice President, Computer Associates (E.D.N.Y. 2006) | Pled guilty to conspiracy to commit securities fraud and wire fraud, securities fraud, false statements to SEC, conspiracy to obstruct justice, obstruction of justice, and perjury. | **$2.2 billion** (according to Government's Sentencing Memorandum) | **LIFE imprisonment** under 2005 Guidelines **151 to 188** under 1998 Guidelines (Unclear how District Court resolved dispute over which version should apply.) | **84 months**[14] 18% of guideline range; life treated as 470 months |
| **Mehdi Gabayzadeh**, CEO, American Tissue (E.D.N.Y. 2006) | Convicted at trial of conspiracy to commit securities fraud, conspiracy to commit bank fraud, bank fraud, wire fraud, interstate transport of property obtained by fraud, bankruptcy fraud, conspiracy to commit perjury, and obstruction of justice. | PSR found total loss of **$193 million** (Court ordered $65 million in restitution.) | **LIFE imprisonment** | **180 months**[15] 38% of guideline range; life treated as 470 months |
| **John Rigas**, Founder, Adelphia (S.D.N.Y. 2004) | Convicted at trial of securities fraud, bank fraud, and conspiracy to: (a) commit securities fraud, (b) commit bank fraud, and (c) make or cause to be made false statements in filings to SEC. | **$2.3 billion** | Guideline range was **LIFE imprisonment**; however, **statutory maximum was 185 years**. | **144 months**[16] 31% of guideline range; life treated as 470 months; 6% of statutory maximum cap |
| **Timothy Rigas**, CFO, Adelphia (S.D.N.Y. 2004) | Convicted at trial of securities fraud, bank fraud, and conspiracy to: (a) commit securities fraud, (b) commit bank fraud, and (c) make or cause to be made false statements in filings to SEC. | **$2.3 billion** | Guideline range was **LIFE imprisonment**; however, statutory maximum was **185 years**. | **204 months**[17] 43% of guideline range; life treated as 470 months; 9% of statutory maximum cap |
| **Jacob Jacobowitz**, Executive VP, Allou Healthcare (E.D.N.Y. 2007) | Pled guilty to making false statements in reports to the SEC. | **$30 million** (ordered in restitution) | Guideline range was **168-210 months**; however, statutory maximum was 120 months. | **84 months**[18] 50% of guideline range; 70% of statutory maximum cap |
| **Herman Jacobowitz** CEO, Allou Healthcare (E.D.N.Y. 2007) | Pled guilty to conspiracy to commit bank, securities, and mail fraud *and* making false statements in reports to SEC. | **$176 million** (ordered in restitution) | Guideline range would have been **LIFE imprisonment**; plea agreement structured to provide statutory maximum of 180 months. | **180 months**[19] 38% of guideline range; life treated as 470 months |

| | | | | |
|---|---|---|---|---|
| ***Aaron Jacobowitz*** <br> Manager of various companies controlled by Jacobowitz family (E.D.N.Y. 2007) | Pled guilty to money laundering. | **$176 million** (ordered in restitution) | Guideline range was **LIFE imprisonment**; plea agreement structured to provide statutory maximum of 120 months. | **120 months**[20] <br> 25% of guideline range; life treated as 470 months |
| ***Carole Argo*** <br> CFO, SafeNet, Inc. (S.D.N.Y. 2008) | Pled guilty to securities fraud. | **$1 - 2.5 million** (stipulated loss amount) | **97 - 121 months** | **6 months**[21] <br> 6% of guideline range |
| ***Lennox Parris***, <br> Director, Queench, Inc. (E.D.N.Y. 2008) | Convicted at trial of conspiracy to commit securities fraud, securities fraud, conspiracy to commit witness tampering, and witness tampering. | **Between $2.5 and $7 million** | **360 months to LIFE** | **60 months**[22] <br> 16.7% of guideline range |
| ***Lester Parris***, <br> Director, Queench, Inc. (E.D.N.Y. 2008) | Convicted at trial of conspiracy to commit securities fraud, securities fraud, conspiracy to commit witness tampering, and witness tampering. | **Between $2.5 and $4.9 million** | **360 months to LIFE** | **60 months**[23] <br> 16.7% of guideline range |
| ***Raquel Kohler***, <br> Mutual Benefit Corp. (S.D. Fla. 2007) | Pled guilty to conspiracy to commit securities fraud. | **$471 million** (ordered in restitution) | Guideline range **324- 405 months**, statutory maximum **120 months**. | **60 months**[24] <br> 18.5% of guideline range; 50% of statutory maximum cap |
| *Marc Dreier,* <br> Managing Partner, Dreier LLP (S.D.N.Y. 2009) | Pled guilty to securities fraud, wire fraud, and conspiracy to commit securities and wire fraud. | **$387 million** (ordered in restitution) | Guideline range **LIFE**, statutory maximum limited sentence to **145 years**. | **240 months**[25] <br> 51% of guideline range; life treated as 470 months; 13.8% of statutory maximum cap |

1.  *United States v. Milton*, Case No. 3:06-cr-00137, Docket Entry 1216 (D. Conn. Jan. 30, 2009) (Judgment); *United States v. Milton*, No. 3:06-cr-00137, Docket Entry 1164 (D. Conn. Oct. 31, 2008) (Ruling on Loss Calculation, Victim Enhancement, and Restitution).

2.  *United States v. Ferguson*, Case No. 3:06-cr-00137, Docket Entry 1199 (D. Conn. Dec. 31, 2008) (Judgment); *United States v. Ferguson*, No. 3:06-cr-00137 , Docket Entry 1164 (D. Conn. Oct. 31, 2008) (Ruling on Loss Calculation, Victim Enhancement, and Restitution).

3.  *United States v. Correll*, Case No. 1:07-cr-00365, Docket Entry 36 (N.D. Ga. June 9, 2009) (Order Granting Motion for Reduction of Sentence).

4.  *United States v. Cole*, 2008 WL 5204441, at *2-3, 9 (N.D. Ohio, Dec. 11, 2008).

5, 6.  Neither the Defendant's nor the Government's sentencing memorandum indicated what the Probation Office had found the advisory guideline range to be. Undersigned counsel contacted Marcia Shein, counsel for Mr. Ledee. Ms Shein reported that the PSR had indicated a total offense level of 51, criminal history category II, and an advisory range of life imprisonment. Ms. Shein also reported that the sentencing court disagreed with some of the PSR's calculation and found a lower guideline range of approximately 20 years. The parties had, however, entered a type C agreement, which capped the sentence at 7.5 years. Although this cap was substantially lower than the advisory guideline range, the sentencing court nevertheless varied even further to impose a sentence of just 70 months. *See United States v. Ledee*, Case Nos. 1:04-cr-0623-BBM and 1:05-cr-0015-BBM, Docket Entry 154 (N.D. Ga. May 8, 2007) (Judgment and Commitment).

7.  *United States v. Whittier*, Case No. 1:07-cr-0087, Docket Entry 12 (S.D.N.Y. Oct. 18, 2007) (Judgment). *See also*, *United States v. Whittier*, 1:07-cr-0087, Docket Entry 14 (S.D.N.Y. Nov. 6, 2007) (Transcript of Sentencing Hearing).

8.  *United States v. Orlansky*, Case No. 1:03-cr-20951, Docket Entry 1196 (S.D. Fla. Nov. 16, 2007) (Judgment). *See also*, *United States v. Orlansky*, Case no. 1:03-cr-20951, Docket Entry 1054 (S.D. Fla. July 17, 2007) (Defendant's Sentencing Memorandum).

9.  *United States v. Adelson*, 441 F. Supp.2d 506, 514 (S.D.N.Y. 2006), *aff'd* 2008 WL 5155341 (2d Cir. Dec. 9, 2008). *See also United States v. Adelson*, Case No. 1:05-cr-00325, Docket Entry 86 (S.D.N.Y. June 6, 2006) (Judgment).

10.  The district court initially imposed a sentence of 292 months (a sentence within the then-mandatory guideline range) after finding an actual loss amount of $105 million. *United States v. Olis*, 429 F.3d 540, 542 (5th Cir. 2005). On appeal, the Fifth Circuit vacated the sentence, finding that the district court's "loss calculation did not take into account the impact of extrinsic factors on Dynegy's stock price decline." *Id.* at 548-49.  On remand, the district court concluded that the actual loss to shareholders could not be reasonably calculated. *United States v. Olis*, 2006 WL 2716048, at * 10 (S.D. Tex. Sept. 22, 2006). The court, therefore, relied on the intended loss figure of $79 million. *Id.* The new loss amount changed the guidelines range to 151-181 months. *Id.*  The court then went on to grant a variance below this advisory range to arrive at a final sentence of just 72 months. *Id.* at 11-13.

11.  *United States v. Shelton*, Case No. 3:02-cr-00264, Docket Entry 1604 (D. Conn. July 13, 2005) (Government's Sentencing Memorandum). *See also United States v. Shelton*, Case No. 3:02-cr-00264, Docket Entry 1635 (D. Conn. Aug. 4, 2005) (Judgment).

12.  *See United States v. Ebbers*, 458 F.3d 110 (2d Cir. 2006). Ebbers' sentence has been widely viewed as "one of the most severe given to a first-time offender for a crime that did not involve violence or trafficking in illegal narcotics." *See* Peter J. Henning, *White Collar Crime Sentences After Booker: Was the Sentencing of Bernie Ebbers Too Harsh I,* 37 MCGEORGE L. REV. 757 (2006).

13.  In its Sentencing Memorandum, the Government argued for a loss calculation of $2.2 billion and set forth the two possible Guideline calculations. *United States v. Kumar*, Case No. 1:04-cr-00846, Docket Entry 223 (E.D.N.Y. Nov. 2, 2006). *See also United States v. Kumar*, Case No. 1:04-cr-00846, Docket Entry 284 (E.D.N.Y. Nov. 27, 2006) (Amended Judgment).

14.  In its Sentencing Memorandum, the Government argued for a loss calculation of $2.2 billion and set forth the two possible Guideline calculations. *United States v. Richards*, Case No. 1:04-cr-00846, Docket Entry 223 (E.D.N.Y. Nov. 2, 2006). *See also United States v. Richards*, Case No. 1:04-cr-00846, Docket Entry 283 (E.D.N.Y. Nov. 22, 2006) (Judgment).

15.  In his Sentencing Letter, Mr. Gabayzadeh conceded a total offense level of 48 (an offense level that results in an advisory sentence of life imprisonment regardless of criminal history score). *See United States v. Gabayzadeh*, Case No. 2:03-cr-00162, Docket Entry 180 (E.D.N.Y. Aug. 17, 2006). *See also United States v. Gabayzadeh*, Case No. 2:03-cr-00162, Docket Entry 190 (E.D.N.Y. Nov. 23, 2006) (Judgment).

16.  Following their conviction and sentencing, John and Timothy Rigas succeeded in obtaining limited relief on appeal. Specifically, the Second Circuit reversed their convictions on one of the counts, and remanded for an entry of acquittal on that count and for resentencing. *United States v. Rigas*, 490 F.3d 208, 239 (2d Cir. 2007). On remand, the District Court concluded

that the elimination of one count of conviction did not change the guideline range (life imprisonment), but did change the aggregate statutory maximum sentence from 215 months to 185 months. *United States v. Rigas*, Case No. 1:02-cr-01236, Docket Entry 428 (S.D.N.Y. June 24, 2008) (Memorandum and Opinion). Though each defendant had already received a substantial variance below the advisory range at the original sentencing, the district court reduced each of the defendants sentences by another three years. *Id*. Accordingly, John Rigas' sentence was reduced from 180 months to 144 months and Timothy Rigas' sentence was reduced from 240 months to 204 months. *Id*.

17.  *See* Endnote 17.

18.  *United States v.  Jacob Jacobowitz*, Case No. 1:04-cr-00558, Docket Entry 141 (E.D.N.Y. July 23, 2007) (Government's Sentencing Memorandum). *See also United States v. Jacobowitz*, Case No. 1:04-cr-00558, Docket Entry 164 (E.D.N.Y. Aug. 8, 2007) (Judgment).

19.  *United States v. Herman Jacobowitz*, Case No. 1:04-cr-00558, Docket Entry 141 (E.D.N.Y. July 23, 2007) (Government's Sentencing Memorandum). *See also United States v. Herman Jacobowitz*, Case No. 1:04-cr-00558, Docket Entry 158 (E.D.N.Y. Aug. 7, 2007) (Judgment).

20.    *United States v. Aaron Jacobowitz*, Case No. 1:04-cr-00558, Docket Entry 141 (E.D.N.Y. July 23, 2007) (Government's Sentencing Memorandum). *See also United States v. Aaron Jacobowitz*, Case No. 1:04-cr-00558, Docket Entry 161 (E.D.N.Y. Aug. 8, 2007) (Judgment).

21.  *United States v. Argo*, Case No. 1:07-cr-00683, Docket Entry 14 (S.D.N.Y. Jan. 23, 2008) (Government's Sentencing Memorandum). *See also United States v. Argo*, Case No. 1:07-cr-00683, Docket Entry 16 (S.D.N.Y. Jan. 29, 2008) (Judgment).

22.  *See United States v. Parris*, 573 F. Supp. 2d 744 (E.D.N.Y. 2008).

23.  *Id.*

24.  *United States v. Kohler*, Case No. 1:07-cr-20446, Docket Entry 65 (S.D. Fla. Sept. 17, 2007) (Defendant's Objections to Presentence Investigation Report). *See also United States v. Kohler*, Case No. 1:07-cr-20446, Docket Entry 84 (S.D. Fla. Oct. 10, 2007) (Amended Judgment).

25.  *United States v. Dreier*, Case No. 1:09-cr-085, Docket Entry 84 (S.D.N.Y. July 17, 2009) (Judgment). *See also United States v. Dreier*, Case No. 1:09-cr-085, Docket Entry 76 (S.D.N.Y. July 8, 2009) (Government's Sentencing Memorandum).